NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3586-19T4

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

ABNER RODRIGUEZ,

      Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

January 25, 2021

APPELLATE DIVISION

Submitted December 14, 2020 – Decided January 25, 2021

Before Judges Fasciale, Mayer, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 19-06-0986.

Yolanda Ciccone, Middlesex County Prosecutor, attorney for appellant (Joie Piderit, Assistant Prosecutor, of counsel and on the brief).

Law Office of Jarred S. Freeman, LLC, attorney for respondent (Jarred S. Freeman, of counsel and on the brief).

    The opinion of the court was delivered by

SUSSWEIN, J.A.D.

By leave granted, the State appeals from the June 22, 2020 Law Division order granting defendant's motion to overrule the prosecutor's rejection of his request for a Graves Act[1] waiver pursuant to N.J.S.A. 2C:43-6.2. That statute "embodies the so called 'escape valve' to the mandatory sentence requirements otherwise embodied in the Graves Act." State v. Alvarez, 246 N.J. Super. 137, 139 (App. Div. 1991). We conclude that defendant failed to establish that the prosecutor's rejection of his request for a Graves Act waiver constituted a patent and gross abuse of discretion. We therefore are constrained to vacate the Law Division order granting a Graves Act waiver.

I.

We begin by recounting the pertinent facts and procedural history, recognizing that because this case comes to us before trial or any evidentiary hearings, the record is sparse. On March 29, 2019, police were preparing to execute a search of defendant and his residence pursuant to a duly issued warrant. The probable cause for the search warrant was predicated on three "controlled buys" of controlled dangerous substances (CDS). Before the

---

[1] The "Graves Act" is named for Senator Francis X. Graves, Jr., who sponsored legislation in the early 1980s that imposed a mandatory minimum term of imprisonment and parole ineligibility on defendants convicted of certain predicate crimes committed while in possession of a firearm. P.L. 1981, c. 31. (N.J.S.A. 2C:43-6(c)). The term "Graves Act" now refers to all firearms offenses that carry a mandatory minimum sentence. See note 10, infra.

officers could execute the search warrant, defendant entered a car operated by Luis Quiles, who police had previously identified as a drug dealer.[2] The vehicle sped off when the officers approached it. During the ensuing motor vehicle pursuit, police observed unknown items tossed from the passenger side window. Those items were later recovered and identified as plastic bags containing approximately eighteen grams of cocaine.[3] After the vehicle stopped, defendant exited and was eventually apprehended.

When police searched defendant's person, they discovered a plastic bag containing a white powdery substance believed to be cocaine and house keys to the residential property identified in the search warrant. Police also searched the vehicle and found $300 in cash and twenty-six prescription pills. The search of defendant's residence pursuant to the warrant revealed additional evidence, including two plastic bags that each contained a gram of suspected cocaine, a bag of marijuana, a digital scale, a box containing empty plastic

---

[2] Quiles, who was indicted as a codefendant, is not a party to this appeal.

[3] We note that eighteen grams of cocaine exceeds the one-half-ounce threshold for a second-degree crime under N.J.S.A. 2C:35-5(b)(2).

bags, a .22 caliber rifle, and sixty-four hollow-point bullets.[4]  The police later determined the rifle was stolen.

Defendant was charged in a Middlesex County indictment with eight counts:[5] third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1); second-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(2); third-degree possession of CDS with intent to distribute on or near school property, N.J.S.A. 2C:35-7; fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1); third-degree financial facilitation of criminal activity (money laundering), N.J.S.A. 2C:21-25(a); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree possession of a firearm while in the course of committing a drug distribution/possession with intent to distribute crime, N.J.S.A. 2C:39-4.1; and third-degree receiving stolen property, N.J.S.A. 2C:20-7.

The charges for violation of N.J.S.A. 2C:39-4(a) and N.J.S.A. 2C:39-4.1 are designated as Graves Act offenses under N.J.S.A. 2C:43-6(c) and carry a mandatory term of parole ineligibility fixed at forty-two months.  By letter

---

[4] The record before us does not indicate whether the hollow-point bullets matched the caliber of the rifle or were for another firearm.

[5] The trial court's June 22, 2019 opinion states that defendant was indicted on fourteen counts.  Our review of the indictment shows that only codefendant Quiles was charged in counts nine to fourteen.

dated May 28, 2019, defendant asked the prosecutor to file a motion for a waiver of the mandatory minimum Graves Act sentence pursuant to N.J.S.A. 2C:43-6.2. In support of that request, defendant attached character reference letters from his employer, family, and friends.

In an October 16, 2019 written response, the prosecutor rejected defendant's request for a Graves Act waiver. In that letter, the prosecutor outlined the charges that defendant faced and recounted the circumstances of his arrest, highlighting the multiple controlled buys, the motor vehicle pursuit, the attempted spoliation of evidence thrown from the fleeing vehicle, and the evidence found in defendant's home. The prosecutor acknowledged that defendant had minimal prior contact with the criminal justice system consisting of a single pretrial diversion in 1990. After identifying and weighing the applicable aggravating and mitigating circumstances set forth in N.J.S.A. 2C:44-1 (a) and (b),[6] the prosecutor concluded that the interests of justice would not be served by waiving the mandatory minimum sentence.

---

[6] As we discuss more fully later in this opinion, the Attorney General has issued a directive that channels the exercise of prosecutorial discretion when deciding whether a Graves Act mandatory minimum sentence should be waived pursuant to N.J.S.A. 2C:43-6.2. See Directive to Ensure Uniform Enforcement of "Graves Act" (Oct. 23, 2008, as corrected Nov. 25, 2008) (Attorney General Directive). That Directive instructs prosecutors to "consider all relevant circumstances concerning the offense conduct and the

Defendant moved before the trial court to overrule the State's rejection of his request for a Graves Act waiver. The State filed a letter brief amplifying the reasons for its decision. The trial court conducted oral argument on defendant's motion on December 20, 2019. On January 9, 2020, the trial court issued an order and written opinion overruling the prosecutor's decision and granting a waiver of the Graves Act mandatory sentence. The court found the State had patently and grossly abused its discretion in refusing to grant defendant's waiver request. The court thus concluded the interests of justice would not be served by imposing the forty-two-month mandatory minimum sentence.

In reaching this conclusion, the trial court found the State provided no support for its contention that defendant's lack of prior criminal history was outweighed by defendant's possession of a firearm in furtherance of his drug dealing. In discounting the weight the prosecutor accorded to the offense conduct, the court reasoned that the firearm was not on defendant's person but rather was found in his bedroom away from any CDS, and there was "no evidence to support the conclusion that [d]efendant possessed the firearm in further[ance] of his 'drug dealing,' as the State suggest[ed]." Additionally, the

_____

(continued)
offender, including those aggravating and mitigating circumstances set forth in N.J.S.A. 2C:44-1." Id. at 12.

court reasoned that the firearm in question, a .22 Remington rifle with scope, was not the sort of firearm typically associated with drug dealing. The court also rejected the prosecutor's contention that defendant was in possession of the eighteen grams of cocaine discarded from the vehicle, reasoning that the driver was a known drug dealer and that only two grams of cocaine were found in defendant's home.

The trial court also disagreed with the prosecutor's contention there was a significant risk that defendant would re-offend, highlighting defendant lacked a significant criminal history and that he was forty-nine years old with a family, gainfully employed, and not designated as a "certain person."[7]

Furthermore, "[t]o aid in its analysis, the court look[ed] to [three] factually similar cases in which Graves waivers have been granted by the State in this county." The trial court stated, "[i]n consideration of the factual similarities of the above cases to the instant case as well as the Attorney General's Directive, which demands 'statewide uniformity in the exercise of prosecutorial discretion in implementing' the Act, the [c]ourt finds that the State's decision not to seek a Graves Waiver was arbitrary and capricious."

---

[7] The term "certain person" refers to a person charged with a violation of N.J.S.A. 2C:39-7, which prohibits the possession of a firearm by a person who has previously been convicted of a crime listed in the statute. We note a defendant charged with N.J.S.A. 2C:39-7 is not eligible for a Graves Act waiver under N.J.S.A. 2C:43-6.2.

Considering both its review of the prosecutor's assessment of aggravating and mitigating circumstances and its comparison of the three other Middlesex County cases where the prosecutor granted Graves Act waivers, the trial court concluded that the prosecutor's decision to reject defendant's request for a Graves Act waiver was "grossly arbitrary, capricious, or an abuse of discretion."

On May 21, 2020, we granted the State's motion for leave to appeal and summarily vacated the trial court's order granting a Graves Act waiver. We remanded to the trial court for reconsideration "without reference to the anecdotal information about [the three other cases mentioned] in the trial court's original determination." Pursuant to our order, the trial court scheduled a reconsideration hearing for June 16, 2020.

On June 15, 2020, another panel of this court issued an opinion in State v. Andrews, 464 N.J. Super. 111 (App. Div. 2020). We held in Andrews that the comparative analysis the trial court conducted—examining past cases where the prosecutor had granted Graves Act waivers—is a legitimate component of the robust judicial review needed to ensure that a prosecutor's rejection of a Graves Act waiver does not "'demonstrate arbitrariness constituting an unconstitutional discrimination or denial of equal protection.'" Id. at 120, 123 (quoting State v. Benjamin, 228 N.J. 358, 372 (2017)).

On the same day we issued our opinion in <u>Andrews</u>, we vacated the portion of our remand order directing the trial court to reconsider its decision without reference to the three other Middlesex County cases.

At the reconsideration hearing on June 16, 2020, the trial court permitted the prosecutor an opportunity, through oral argument, to distinguish the three Middlesex County cases that had been cited by the court in its January 9 opinion. We summarize the prosecutor's arguments as follows:

In <u>State v. Olivares</u>, Indictment No. 16-06-1040, police executed a search warrant of the residence Olivares shared with two codefendants. Police found a handgun and a loaded 9mm extended magazine. They also found a 9mm bullet inside a chest, as well as heroin and drug paraphernalia. Olivares was known to be affiliated with a gang. He had one prior juvenile diversion and one prior municipal court conviction.

The prosecutor distinguished the present case by highlighting Olivares's willingness to accept responsibility for his conduct by pleading guilty. The prosecutor also noted that Olivares was not the target of the search warrant; rather, his two housemates were. Police found the firearm and contraband in a common area of the house. The police found only marijuana on Olivares's person. The prosecutor stressed that Olivares was the least culpable of the

three defendants who pled guilty and that Olivares's codefendants pled guilty to possession of the gun and drugs.

In State v. Moses, Indictment No. 17-10-1191-I, police responded to a report of three individuals smoking marijuana.  The officers observed Moses and his companions standing on the front steps of the apartment building in which Moses resided.  Apparently startled by the officers' arrival, Moses started to walk away but was ordered to halt and he complied.  Police found a loaded handgun on his person, which they later discovered had been reported stolen.  Moses had two prior municipal court convictions for CDS possession. Moses claimed he possessed the gun for "self-protection."

The prosecutor explained the Graves Act waiver decision was premised on an assessment of the likelihood that Moses would be convicted at trial.  The prosecutor highlighted that Moses was standing on the front steps of his apartment building when he was arrested, and noted had Moses been standing just three feet away he would have been within his own home and would have been exempt from criminal liability for possessing the weapon.  More importantly, the prosecutor also noted the waiver was part of a plea agreement.

In State v. Miller, Indictment No. 15-07-803, the defendant ran from police when they approached to execute an outstanding arrest warrant.[8] The police chased Miller to his apartment, where they found a single bag of crack cocaine, a .38 caliber revolver loaded with six hollow-point bullets, drug paraphernalia, and $2,856 in cash. A subsequent search of the apartment resulted in the discovery of a scale, fifty-two clear zip-lock baggies, and a measuring cup with cocaine residue. Defendant had a prior third-degree CDS possession conviction.

The prosecutor acknowledged Miller had a prior criminal record and that the handgun was found in a puffy vest he had been wearing during the foot-chase, indicating that he had carried the handgun on his person. The prosecutor nonetheless distinguished the present case by noting Rodriguez was the target of an ongoing narcotics investigation and police had a search warrant based on probable cause to believe that his house was being used for drug distribution purposes. Furthermore, the prosecutor argued Rodriguez obstructed the execution of the search warrant not only by fleeing in a motor vehicle but also by discarding evidence, and the amount of CDS involved was far more than was contained in the single bag of crack cocaine found in Miller's possession.

---

[8] The record does not indicate why the arrest warrant had been issued.

On June 22, 2020, the trial court issued a new written order and opinion granting a Graves Act waiver. This second opinion repeated much of the reasoning set forth in the trial court's original opinion. The court, citing Andrews, stated simply that "[t]his [c]ourt is not persuaded by the State's proffered factual distinctions between those cases and the case at hand such that they warrant different treatment in granting of a Graves [w]aiver and, ultimately, sentencing." The court did not provide specific reasons why the distinctions proffered by the prosecutor were insufficient.

## II.

We next turn our attention to the history of the Graves Act and the legal principles governing the imposition—and waiver—of its stern sentencing provisions. "Enacted in 1981 as 'a direct response to a substantial increase in violent crime in New Jersey,' the Graves Act is intended 'to ensure incarceration for those who arm themselves before going forth to commit crimes.'" State v. Nance, 228 N.J. 378, 390 (2017) (quoting State v. Des Marets, 92 N.J. 62, 68 (1983)). "Underlying this statute is a legislative intent to deter individuals from committing firearm-related crimes by calling for a mandatory minimum term of imprisonment for those convicted of Graves Act offenses." Benjamin, 228 N.J. at 367 (quoting Des Marets, 92 N.J. at 71).

From the start, the Supreme Court took steps to ensure strict adherence to the mandatory minimum sentencing framework adopted by the Legislature. On April 27, 1981, Chief Justice Wilentz issued a memorandum "to ensure that mandatory prison terms pursuant to N.J.S.A. 2C:43-6(c), the Graves Act, were imposed in accordance with the Legislature's intent." Administrative Directive #09-18, "Guidelines for Downgrading/Dismissals Under the Graves Act: Strict Enforcement of Mandatory Minimum Custodial Terms for Offenses Involving Firearms" (July 2, 2018) (describing Administrative Directive #10-80, "Sentencing Guidelines for Dismissals Under the Graves Act" (April 27, 1981)) (AOC Directive #09-18).[9] As part of that memorandum, the Chief Justice promulgated guidelines setting forth the limited circumstances when a judge may approve a negotiated plea involving dismissal of an offense carrying a mandatory custodial term.

As originally enacted, the Graves Act applied to all defendants convicted under N.J.S.A. 2C:39-4(a), which prohibits possession of a gun with intent to use it against the person or property of another. In 1982, N.J.S.A. 2C:43-6(c)

---

[9] The 1981 Directive #10-80 was superseded by the 2018 Directive #09-18 because of new amendments to the referenced offenses and the mandatory custodial terms. The updated directive makes clear that "the overall purposes in that [earlier] directive are still applicable" and that the guidelines in 1981 Directive #10-80 explaining when a trial judge may accept a negotiated plea involving a dismissal of a Graves Act offense remain in effect. 2018 Directive #09-18, at 1–2.

was amended to apply upon conviction under N.J.S.A. 2C:39-4(a) only when the defendant intends to use the gun against a person. L. 1982, c. 119, § 1 (codified at N.J.S.A. 2C:43-6). See also N.J.S.A. 2C:43-6.1 (permitting resentencing of a person sentenced under the Graves Act for a firearms conviction under N.J.S.A. 2C:39-4(a) based on the use of a firearm against the property of another). The 1982 amendment "was passed to avoid what the Legislature apparently concluded was undue severity in applying the Graves Act under those circumstances." Des Marets, 92 N.J. at 79, n.16.

In 1989, the Legislature enacted N.J.S.A. 2C:43-6.2 to "mitigate the undue severity that might accompany the otherwise automatic application of the mandatory minimum sentence under the Graves Act[.]" Benjamin, 228 N.J. at 368. This statute authorizes a "limited exception that allows certain first-time offenders to receive a reduced penalty if the imposition of a mandatory term would not serve the interests of justice." Ibid. Specifically, N.J.S.A. 2C:43-6.2 provides:

> On a motion by the prosecutor made to the assignment judge that the imposition of a mandatory minimum term of imprisonment under [the Graves Act] for a defendant who has not previously been convicted of [a Graves Act] offense . . . does not serve the interests of justice, the assignment judge shall place the defendant on probation pursuant to [N.J.S.A. 2C:43–2(b)(2)] or reduce to one year the mandatory minimum term of imprisonment during which the defendant will be ineligible for parole. The sentencing court may also

14

refer a case of a defendant who has not previously been convicted of an offense under that subsection to the assignment judge, with the approval of the prosecutor, if the sentencing court believes that the interests of justice would not be served by the imposition of a mandatory minimum term.

The relief afforded by section N.J.S.A. 2C:43-6.2 arises in two ways. The prosecutor can make a motion to the assignment judge for a waiver of the mandatory minimum penalty. Alternatively, the sentencing judge may refer the matter to the assignment judge if the prosecutor approves the referral. In either procedure, the prosecutor must approve the waiver before the assignment judge is authorized to impose one of the two reduced penalties. Benjamin, 228 N.J. at 368–69.

In State v. Alvarez, we addressed whether this delegation of de facto sentencing authority to the prosecutor violates the separation of powers doctrine. 246 N.J. Super. 137 (App. Div. 1991). Judge Edwin H. Stern aptly recognized that because "there is the prospect of discriminatory decisions, and because we construe the statute as imposing a prosecutorial standard, 'we cannot imagine that the Legislature meant to oust the courts of the right and opportunity to examine whether such a decision exceeds the permitted 'prosecutorial influence on the sentencing determination'." Id. at 148 (quoting State v. Todd, 238 N.J. Super. 445, 461–462 (App. Div. 1990)). We concluded that the waiver statute is constitutional "because the Assignment Judge has the

15

ultimate authority to decide whether the prosecutor arbitrarily or unconstitutionally discriminated against a defendant in determining whether the interests of justice warrant referral to the Assignment Judge." Id. at 147.

Alvarez adopted the patent and gross abuse of discretion standard of judicial review that applies to the review of a prosecutor's decision to admit a defendant to pretrial intervention (PTI). Id. at 147–48. See also State v. Leonardis, 73 N.J. 360, 370 (1977). The Supreme Court has since confirmed that a prosecutor's decision under N.J.S.A. 2C:43-6.2 is reviewed under this highly deferential standard. Benjamin, 228 N.J. at 364 (a defendant may "appeal the denial of [the Graves Act] waiver to the assignment judge upon a showing of patent and gross abuse of discretion by the prosecutor."). The Supreme Court had previously defined the patent and gross abuse of discretion standard as one in which the defendant must demonstrate that "the prosecutor's decision failed to consider all relevant factors, was based on irrelevant or inappropriate factors, or constituted a 'clear error in judgment.'" State v. Nwobu, 139 N.J. 236, 247 (1995) (citing State v. Bender, 80 N.J. 84, 93 (1979)). The Nwobu Court emphasized that a reviewing court applying this deferential standard does not have the authority to substitute its own discretion for that of the prosecutor. Id. at 253.

In 2007, the Legislature amended N.J.S.A. 2C:43-6(c), greatly expanding the reach of the Graves Act. See L. 2007, c. 341 (codified at N.J.S.A. 2C:43-6). Before this expansion, the Graves Act applied only when a person was convicted of possessing or using a firearm while in the course of committing certain predicate crimes or possessing a firearm for an unlawful purpose in violation of N.J.S.A. 2C:39-4(a). The revised statute[10] imposed a Graves Act mandatory minimum sentence for anyone convicted of unlawful possession of a firearm, regardless whether the defendant was concurrently committing another crime or had a purpose to use the firearm unlawfully. The "simple" unlawful possession offense in N.J.S.A. 2C:39-5 was not only added

---

[10] The Graves Act now applies to a defendant who has been convicted of one of the following offenses: possession of a sawed-off shotgun or defaced firearm, N.J.S.A. 2C:39-3(b), (d); possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); possession of a firearm while in the course of committing a drug distribution/possession with intent to distribute crime or bias crime, N.J.S.A. 2C:39-4.1(a); unlawful possession of a machine gun, handgun, rifle or shotgun, or assault firearm, N.J.S.A. 2C:39-5(a), (b), (c), (f); certain persons not to have weapons, N.J.S.A. 2C:39-7(a), (b)(2), (b)(3); and manufacture, transport, disposition and defacement of machine guns, sawed-off shotguns, defaced firearms, or assault firearms, N.J.S.A. 2C:39-9(a), (b), (e), (g). N.J.S.A. 2C:43-6(c).

The Graves Act also applies to a defendant who "used or was in possession of a firearm" while in the course of committing, attempting to commit, or fleeing from the following crimes: murder, N.J.S.A. 2C:11-3; manslaughter, N.J.S.A. 2C:11-4; aggravated assault, N.J.S.A. 2C:12-1(b); kidnapping, N.J.S.A. 2C:13-1; aggravated sexual assault, N.J.S.A. 2C:14-2(a); aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a); robbery, N.J.S.A. 2C:15-1; burglary, N.J.S.A. 2C:18-2; and escape, N.J.S.A. 2C:29-5. N.J.S.A. 2C:43-6(c).

to the Graves Act list but also was upgraded from a third-degree crime to a second-degree crime. Prior to this revision, most persons charged with simple possession of a firearm—the most commonly charged gun offense—were entitled upon conviction to a presumption of non-incarceration, i.e., probation, pursuant to N.J.S.A. 2C:44-1(e). Under the revised statute, those persons are subject to both the mandatory minimum sentencing provisions of the Graves Act and the presumption of imprisonment that applies to second-degree convictions pursuant to N.J.S.A. 2C:44-1(d). The 2007 amendment also added N.J.S.A. 2C:39-4.1 (possession of a firearm while in the course of committing a drug distribution/possession with intent to distribute crime) to the list of Graves Act offenses. L. 2007, c. 341, § 5. In addition to expanding the scope of the Graves Act by significantly increasing the number of gun offenders subject to a mandatory minimum sentence, the 2007 amendment increased the mandatory minimum term of parole ineligibility from three years to forty-two months. Ibid.

The significant expansion of the Graves Act and resultant strengthening of our gun laws prompted the Attorney General to issue a statewide directive to police and prosecutors in October 2008. See note 6, supra. The Attorney General Directive was issued "[t]o ensure statewide uniformity in the enforcement of the Graves Act, and to provide reasonable incentives for guilty

defendants to accept responsibility by pleading guilty in a timely manner so as to maximize deterrence by ensuring the swift imposition of punishment." Attorney General Directive at 4. The Directive channels the exercise of a prosecutor's plea-bargaining discretion, thereby addressing the separation-of-powers concerns raised in Alvarez. Recognizing the trial court system might be overwhelmed unless the significantly expanded number of Graves Act offenders were provided incentive to waive their right to a jury trial by pleading guilty, the Directive instructs prosecutors to tender a "standardized" plea offer that invokes N.J.S.A. 2C:43-6.2 to reduce the term of parole ineligibility to one year. Id. at 13. That standardized offer must be tendered "unless the prosecuting agency determines that the aggravating factors applicable to the offense conduct and offender outweigh any applicable mitigating circumstances," or "unless the prosecuting agency determines that a sentence reduction to a one-year term of parole ineligibility would undermine the investigation or prosecution of another." Ibid.

As we have mentioned in note 6, supra, the Attorney General Directive provides

> [i]n determining whether to move for or approve the waiver or reduction of the minimum term of parole ineligibility pursuant to N.J.S.A. 2C:43-6.2, the prosecuting agency shall consider all relevant circumstances concerning the offense conduct and the offender, including those aggravating and mitigating

A-3586-19T4

circumstances set forth in N.J.S.A. 2C:44-1. The prosecuting agency may also take into account the likelihood of obtaining a conviction at trial.

[Id. at 12.]

The Directive further requires the prosecutor to "document in the case file its analysis of all the relevant aggravating and mitigating circumstances, whether or not the agency moves for or approves a waiver or reduction pursuant to N.J.S.A. 2C:43-6.2." Id. at 13. The Directive instructs "[a] copy of all case-specific memorializations required by this Section shall also be maintained in a separate cumulative file in order to facilitate such audits as the Attorney General may from time-to-time direct to ensure the proper and uniform implementation of this Directive." Id. at 14.

In Benjamin, the Supreme Court concluded that sufficient procedural safeguards were in place to protect a defendant's right to challenge the denial of a Graves Act waiver. 228 N.J. at 371–73. The Court noted "[a]ll case-specific files should contain a statement of reasons which, upon a defendant's Alvarez motion, the assignment judge may consider in assessing the prosecutor's conduct, as the statement will show the prosecutor's reasons not to grant a waiver for a particular defendant." Id. at 373. The Court explained that prosecutors are "guided by standards, inform defendants of the basis for their decisions, and are subject to judicial oversight." Ibid. "This judicial

A-3586-19T4

backstop," the Court concluded, "ensures that prosecutorial discretion is not unchecked because the assignment judge retains 'ultimate authority' to review the prosecutor's waiver decisions for arbitrariness and discrimination." Ibid. (citing Alvarez, 246 N.J. Super. at 146–47).

Although the prosecutor must provide a defendant with a statement of reasons for denying his or her request for a Graves Act waiver, id. at 361, the Court held that a defendant is not entitled to discovery of the prosecution's files for cases in which Graves Act waivers have been granted to other defendants. Ibid. This brings us to our recent decision in Andrews.

The trial court in that case compiled the statements of reasons the prosecutor had issued to other defendants in Middlesex County. Using that compendium as a reference resource, the trial court identified three cases involving other defendants who appeared to be similarly situated to Andrews but were granted a waiver. The prosecutor challenged that comparative methodology, asserting on appeal "the trial court's review of the prosecutor's Graves Act waiver decision is limited to the case before it for review and does not extend to other similarly-situated defendants." Andrews, 464 N.J. Super. at 122. We rejected the State's contention, highlighting that its position in Andrews was markedly different from the approach the State had taken in Benjamin, where "the State stressed[d] that because all waiver applications . . .

21

pass through the assignment judge, that judge is in the 'best position' to identify discriminatory practices." Id. at 122–23 (quoting Benjamin, 228 N.J. at 366). We held that although Benjamin does not afford a defendant the right to discovery of the statements of reasons prepared in other cases, judges are not prohibited "from maintaining those files and relying on them in evaluating 'the prosecutor's waiver decisions for arbitrariness and discrimination.'" Id. at 123 (quoting Benjamin, 228 N.J. at 373). We also noted that in his dissenting opinion in Benjamin, Justice Albin commented "[n]othing prevents the judiciary from maintaining [the statements of reasons filed with the assignment judge in other waiver cases] in a central file so that historical information will be available to . . . assignment judges." Ibid. (quoting Benjamin, 228 N.J. at 377–78) (Albin, J., dissenting) (alterations in original).

Importantly, we held in Andrews the trial court's "robust review and analysis were sound, and fulfilled the role contemplated in Benjamin to 'ensure[] that prosecutorial discretion is not unchecked.'"[11] Id. at 124 (quoting Benjamin, 228 N.J. at 373) (alteration in original). We thus accepted the

---

[11] In Benjamin, the Supreme Court recognized that in the context of PTI where the prosecutor similarly exercises significant discretion, "the defendant [claiming disparate treatment] could not prevail merely because she could show that the prosecutor approved PTI for others 'charged with similar offenses.'" 228 N.J. at 374 (quoting State v. Sutton, 80 N.J. 110, 120 (1979)). "Rather, the defendant needed to prove that she received 'less favorable treatment than identically situated individuals.'" Ibid.

validity and utility of a review process in which the trial court compares the present waiver decision with selected other cases where the prosecutor reached a different conclusion.

Aside from contesting the validity of this form of selective enforcement analysis, the prosecutor in <u>Andrews</u> argued that its application in that particular instance was "fatally flawed" because "the prosecutor was unfamiliar with those unrelated cases" and "was not given a meaningful opportunity to address the court's concerns based on its comparisons." <u>Id.</u> at 123. We rejected the prosecutor's procedural arguments, noting that because the prosecutor had prepared the statements of reason the trial court compiled and relied upon, the prosecutor had access to all case-specific memorializations. <u>Ibid.</u> Importantly, we also noted the prosecutor in that case had not requested an opportunity to address the trial court's specific concerns. <u>Id.</u> at 124.

The State in <u>Andrews</u> remained steadfast in its fundamental opposition to the comparative review methodology employed by the trial court. The prosecutor thus apparently made a strategic decision not to offer specific explanations to distinguish the other cases cited by the trial court. We emphasized in <u>Andrews</u> that despite the State's argument that the three cases relied on by the trial court were "poor candidates for comparison" and the trial

A-3586-19T4

court's analysis was "cursory," on appeal the State never moved for reconsideration nor offered any substantive basis for its "bald conclusions." Id. at 124. We thus determined the prosecutor "failed to respond to the trial's concerns," id. at 123, leading us to affirm the trial court's grant of a Graves Act waiver. See Nwobu, 139 N.J. at 247 (holding that a prosecutor's failure to consider all relevant factors constitutes a patent and gross abuse of prosecutorial discretion).

III.

The gravamen of our decision in Andrews is that a prosecutor's disparate treatment of similarly situated defendants can be a relevant consideration as part of the judicial review of a prosecutor's decision to deny a Graves Act waiver. We refer to this approach as the comparative analysis methodology. In stark contrast to the position taken by the State in Andrews, in this appeal the State does not argue that a trial court's review of a prosecutor's Graves Act waiver decision must focus solely on the case before it.[12]

Under the analytical paradigm embraced in Andrews, when a trial court identifies other cases where it appears similarly situated defendants were granted a Graves Act waiver, the prosecutor must explain why those other

---

[12] We note the prosecuting agency in Andrews is also the prosecuting agency in the present case. The prosecutor did not seek leave to appeal our published decision in Andrews.

24

defendants were not similarly situated to the defendant at bar. Andrews, 464 N.J. Super. at 121, 123. This may be done by identifying specific facts and circumstances about the offense conduct, offender's background, plea negotiation status, likelihood of obtaining a conviction at trial, or other relevant circumstances that distinguish those other cases from the present one. See Attorney General Directive at 12 (outlining relevant factors that a prosecutor may consider in granting or denying a Graves Act waiver). The failure to respond to the trial court's concerns, as in Andrews, thus permits the court to conclude that the prosecutor acted arbitrarily, constituting a patent and gross abuse of discretion. Andrews, 464 N.J. Super. at 124. In practical effect, Andrews applied a form of the so called "burden shifting template" used in selective enforcement litigation. In State v. Segars, for example, the Court held that while a defendant claiming selective enforcement bears the ultimate burden of proving a discriminatory purpose underlying the State's actions, once the defendant has established a prima facie case, the burden of production then shifts to the State to articulate a legitimate basis for its action. 172 N.J. 481, 493–494 (2002). Although that burden of production "has been described as so light as to be 'little more than a formality,'" it is also well-established that

for the State to prevail, it cannot remain silent once the defendant has established a prima facie case of discrimination. Ibid.[13]

Because the prosecutor in Andrews failed to offer specific reasons for distinguishing the earlier cases identified by the judge, we had no occasion in that case to consider how a trial court should resolve fact-sensitive disputes as to whether the other specified defendants granted a Graves Act waiver were similarly situated to the defendant challenging the rejection of his waiver request. We now expound on how this methodology should be applied when, as in the case before us, the prosecutor offers reasons to distinguish the defendant from other specified defendants who were granted a Graves Act waiver.

It bears noting at the outset that this review methodology is anecdotal, not empirical, and necessarily involves subjective assessments of not only the present case but also the earlier cases used for comparison. The challenge is to ensure a reviewing court properly compares proverbial apples to apples when deciding whether the prosecutor's decision to reject a defendant's request for a Graves Act waiver is arbitrary or discriminatory. We next identify and explain

---

[13]  In Segars, the Court found the defendant had been targeted by police for suspicion based on his race. We emphasize in the matter presently before us, there is no allegation that defendant was treated differently from other defendants based on his race or ethnicity.

certain basic principles to guide our review of the trial court's conclusion that the prosecutor in this case treated other similarly situated defendants differently.

## A.

<u>Adherence to the Patent and Gross Abuse of Discretion Standard of Review</u>

We begin by emphasizing the comparative analysis methodology does not displace the patent and gross abuse of discretion standard of judicial review first adopted in <u>Alvarez</u> and later confirmed in <u>Benjamin</u>. To the contrary, that overarching standard applies to the judicial review of all aspects of a prosecutor's waiver decision, including not only the prosecutor's assessment of the aggravating and mitigating circumstances pertaining to the present case under review, but also the prosecutor's assessment of other cases where a waiver was granted. As we have previously noted, the gravamen of our decision in <u>Andrews</u> is that the prosecutor's treatment of similarly situated defendants can be a relevant circumstance as part of the judicial review process. Accordingly, a prosecutor's assessment of the fact-sensitive distinctions between the case at bar and other cases claimed to involve similarly situated defendants is entitled to the same deference given to the prosecutor's assessment of any other relevant circumstance.

27

A court reviewing a prosecutor's rejection of a request for a Graves Act waiver, as with the review of a prosecutor's rejection of a PTI application, must "view the prosecutor's decision through the filter of the highly deferential standard of review." State v. Waters, 439 N.J. Super. 215, 237–38 (App. Div. 2015) (quoting State v. Wallace, 146 N.J. 576, 589 (1996)). In this regard, we emphasize the comparative analysis methodology serves as a "judicial backstop" to guard against prosecutorial arbitrariness, vindictiveness, or discrimination. See Andrews, 464 N.J. Super. at 123. It may not be used as an artifice to allow a trial court to "substitute its own discretion for that of the prosecutor." Nwobu, 139 N.J. at 253.

B.

Using Formal Charges as a Benchmark for Comparing Defendants

Formal charges approved by a judge or a grand jury can provide an objective yardstick with which to compare cases. In Benjamin, the Court cited State v. Sutton for the proposition that a defendant cannot prove disparate treatment merely by showing the prosecutor treated "others charged with similar offenses" differently. Benjamin, 228 N.J. at 374 (quoting Sutton, 80 N.J. at 120)). See note 11, supra. But when the other defendants in the comparison group are not even charged with similar offenses, it is hard to imagine a defendant could demonstrate disparate treatment constituting a

patent and gross abuse of prosecutorial discretion. As a general proposition, therefore, a past defendant who was charged with different offenses than the defendant at bar should not be deemed to be similarly situated for purposes of the comparative analysis methodology.

As we have noted, the Graves Act was expanded in 2007 to include a spectrum of gun-related offenses. A person charged with simple possession of a firearm under N.J.S.A. 2C:39-5—added to the Graves Act list in 2007—stands in a different position from a defendant charged with possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a), or a defendant who possessed a firearm while in the course of committing another crime.

So too, a defendant charged with N.J.S.A. 2C:39-4.1 (possession of a firearm while in the course of committing a drug distribution/possession with intent to distribute crime) stands in a different position from a defendant charged with a violation of N.J.S.A. 2C:39-5. The Legislature has recognized that given the violence associated with the illicit drug trade, there are special dangers posed by drug dealers who have access to firearms. See Report to the Governor by the Attorney General on the Need to Update the Comprehensive Drug Reform Act of 1987 (Dec. 9, 1996) (stating that "[f]irearms have become ubiquitous in the world of illegal drug activity. Dealers are armed to protect themselves from law enforcement officers, from other dealers and from their

customers."). We have no reason to believe the nexus between drug trafficking and gun violence that impelled the enactment of N.J.S.A. 2C:39-4.1 has abated since that offense was added to the list of Graves Act offenses in 2007. It bears noting, moreover, when a person is convicted of both the gun offense under N.J.S.A. 2C:39-4.1 and the underlying offense of drug distribution/possession with intent to distribute, the court must impose consecutive sentences.[14] This distinctive sentencing feature amply demonstrates that persons charged with N.J.S.A. 2C:39-4.1 are not similarly situated with persons charged with other Graves Act offenses.

When comparing cases, a reviewing court should consider not only differences with respect to the specific Graves Act charges, but also differences with respect to the type and number of other charges. When determining whether a defendant is an appropriate candidate for a Graves Act waiver, the prosecutor may of course consider all relevant circumstances

---

[14] N.J.S.A. 2C:39-4.1(d) provides in pertinent part:

> Notwithstanding the provisions of N.J.S.A. 2C:44-5 or any other provision of law, the sentence imposed upon violation of this section shall be ordered to be served consecutively to that imposed for any conviction for a violation of any of the sections of chapter 35 or chapter 16 referred to in this section or a conviction for conspiracy or attempt to violate any of those sections.

pertaining to the need for punishment and deterrence, including criminal conduct besides that covered by a Graves Act offense. <u>See</u> <u>Attorney General Directive</u> at 12. Thus, for purposes of the comparative analysis methodology, a defendant who is charged with multiple distinct crimes in addition to a Graves Act offense—reflecting the scope and breadth of his or her alleged criminal activity—is not similarly situated to a defendant who is charged only with a Graves Act offense.

## C.

### Distinguishing Graves Act Waivers That Were Negotiated

Reviewing courts applying the comparative analysis methodology must be mindful of the procedural status of the case under review and the cases used for comparison. The Graves Act, it must be remembered, is a <u>sentencing</u> statute, as is the statute that provides the so called "escape valve" for the otherwise mandatory forty-two-month term of parole ineligibility, N.J.S.A. 2C:43-6.2. It is generally premature for a court to pronounce sentence before verdict by trial or guilty plea.[15]

---

[15] <u>Rule</u> 3:9-3(c) permits a trial court, with the consent of both counsel, to tentatively indicate the maximum sentence it would impose in the event the defendant enters a plea of guilty. There is no indication in the record before us that this rule was invoked, that defendant has expressed a willingness to plead guilty to the two charged Graves Act gun offenses or would do so without also resolving the six other charges that are pending against him, or that the

The Attorney General Directive expressly contemplates that Graves Act waiver decisions may be made in the context of plea negotiations. Indeed, one of the clearly-expressed purposes of that Directive is "to provide reasonable incentives for guilty defendants to accept responsibility by pleading guilty in a timely manner so as to maximize deterrence by ensuring the swift imposition of punishment." Attorney General Directive at 4. The Supreme Court in Benjamin commented that the Attorney General Directive "ensures even application throughout the state by requiring all prosecutors to consider the same factors and adhere to the same plea procedures." Benjamin, 228 N.J. at 358 (emphasis added).

It is well-settled, moreover, that:

> "Plea bargaining has become firmly institutionalized in this State as a legitimate, respectable and pragmatic tool in the efficient and fair administration of criminal justice." State v. Taylor, 80 N.J. 353, 360–61 (1979). A key component of plea bargaining "is the 'mutuality of advantage' it affords to both defendant and the State." Id. at 361. Simply stated, plea bargaining "enables a defendant to reduce his penal exposure and avoid the stress of trial while assuring the State that the wrongdoer will be punished and that scarce and vital judicial and prosecutorial resources will be conserved through a speedy resolution of the controversy." Ibid.

(continued)
prosecutor consented to the announcement of a tentative sentence on the isolated gun charges.

[State v. Means, 191 N.J. 610, 618 (2007).]

One of the quintessential features of plea bargaining is the State's agreement to reduce a defendant's penal exposure in exchange for the defendant's guilty plea. Consequently, a defendant who pleads guilty pursuant to a negotiated agreement will often receive a lesser sentence than would be imposed on an otherwise similarly situated defendant who has not pled guilty. See State v. Balfour, 135 N.J. 30, 38–39 (1994) ("[t]raditionally a guilty plea is a material factor bearing on the ultimate sentence [that] can have a lenient influence on the trial court's sentencing disposition.") (citing State v. Thomas, 61 N.J. 314, 321 (1972) and State v. Taylor, 49 N.J. 440, 455 (1967)). For these reasons, defendants in a comparison group who obtained a Graves Act waiver pursuant to a plea bargain cannot be considered to be similarly situated to a defendant who has not yet agreed to plead guilty.

We add that the plea-bargaining process can be used to provide incentive for a defendant to turn State's evidence and cooperate in the prosecution of codefendants or other more culpable offenders. The Attorney General Directive expressly provides in this regard that a prosecutor may choose not to tender a "standardized" plea offer if the resulting sentence reduction would "undermine the investigation or prosecution of another." Attorney General Directive at 13. This feature comports with AOC Directive #09-18, which

imposes strict limits on when a court may dismiss an offense carrying a mandatory custodial term under the Graves Act. One of the circumstances when such a dismissal is authorized arises when, "[t]he prosecutor states on the record, either in camera or in open court, that the plea bargain is essential to ensure defendant's cooperation with the prosecution." AOC Directive #09-18 at 2.

In view of this well-established plea bargaining framework, a prosecutor may not be willing to accept a defendant's request for a Graves Act waiver—especially before plea negotiations have concluded—because the resultant reduction in sentence exposure might also reduce the defendant's willingness to cooperate with law enforcement in the investigation and prosecution of codefendants or others. This circumstance might readily distinguish a case under review from other cases where Graves Act waivers were granted. Cf. State v. Williams, 317 N.J. Super. 149, 153, 159 (App. Div. 1998) (rejecting the defendant's contention that his "extended sentence was grossly disparate to the lenient term imposed on the codefendant," noting that "their situations were wholly dissimilar [in part because the codefendant] provided meaningful cooperation with the prosecutor.").

## D.

Identifying the True Outlier

34

A trial court applying the comparative analysis methodology must be circumspect when relying on a small cadre of cases, much less only one or two anecdotal examples, in determining whether defendant has adequately "demonstrate[d] 'arbitrariness constituting an unconstitutional discrimination or denial of equal protection' in the prosecutor's decision." Andrews, 464 N.J. Super. at 120 (quoting Benjamin, 228 N.J. at 372). It is unrealistic and unreasonable to expect prosecutors to be perfectly uniform and consistent in their assessment of the case-sensitive aggravating and mitigating circumstances to be considered when making Graves Act waiver decisions. Cf. Benjamin, 228 N.J. at 372 (acknowledging that "some disparity in sentencing is inevitable."). The case-by-case evaluative process, after all, is not empirical, and there is no precise mathematical formula guiding the exercise of prosecutorial discretion to grant or reject Graves Act waivers. The analytical process prosecutors use to weigh relevant aggravating and mitigating factors when making waiver decisions is qualitative, not quantitative, just as it is for sentencing courts. See State v. L.V., 410 N.J. Super. 90, 108 (App. Div. 2009) ("[m]erely enumerating [the applicable aggravating and mitigating] factors does not provide any insight into the sentencing decision, which follows not from a quantitative, but from a qualitative, analysis.") (citing State v. Kruse, 105 N.J. 354, 363 (1987)). We

therefore believe requiring near-perfect consistency in exercising prosecutorial discretion is not only unworkable, but also fundamentally at odds with the substantial deference afforded to prosecutors under Alvarez and Benjamin.

A patent and gross abuse of discretion is not automatically established by finding one or two cases where similarly situated defendants were granted a waiver. It is conceivable that the earlier decision, rather than the one currently under review, is the aberration—albeit one that was not challenged as such because it worked to that defendant's advantage. A prosecutor's decision to extend leniency in a particular case does not mean the die has been cast in all future cases involving similar circumstances. Were it otherwise, prosecutors might be dissuaded from granting waivers in close cases for fear of setting binding precedent, thus reducing their ability to exercise reasoned discretion in future cases.

We believe the comparative analysis methodology would provide a more compelling basis to overrule a prosecutor's decision if it were shown that the decision under review is an outlier, inconsistent with multiple prior cases rather than just a select few. We add that a prosecutor responding to a trial court's concerns is free, of course, to identify other cases involving similarly situated defendants where a Graves Act waiver was denied.

A-3586-19T4

We next apply these general principles to the comparative analysis undertaken in this case. In sharp contrast to the proceedings in <u>Andrews</u>, here the prosecutor offered specific reasons to explain why defendant is not similarly situated to the defendants who received Graves Act waivers in the three other cases cited by the trial court. The trial court rejected the prosecutor's analysis, stating only, "[t]his [c]ourt is not persuaded by the State's proffered factual distinctions between those cases and the case at hand such that they warrant different treatment in granting of a Graves [w]aiver and, ultimately, sentencing."

We believe the trial court did not accord sufficient deference to the prosecutor's assessment of the distinguishing circumstances. The court instead substituted its own judgment for the prosecutor's. Applying the guiding principles identified in section III, <u>supra</u>, we are satisfied the prosecutor proffered adequate explanations demonstrating the comparison defendants—Olivares, Moses, and Miller—were not similarly situated to defendant Rodriguez, and, therefore, the decisions to grant them Graves Act waivers do not establish that Rodriguez was treated in an arbitrary or discriminatory manner.

Notably, Olivares and Moses both received Graves Act waivers after pleading guilty pursuant to negotiated agreements. In the present case, defendant sought to reduce his Graves Act sentencing without agreeing to cooperate against codefendant Quiles or other persons in the chain of supply of cocaine, and without pleading guilty in exchange for the prosecutor's agreement to waive the Graves Act mandatory sentence. As we previously noted, defendants who bargained for a Graves Act waiver in exchange for a guilty plea are not similarly situated to defendants who have not pled guilty.

Additional distinguishing circumstances further demonstrate the State did not abuse its discretion by treating defendant differently from Olivares and Moses. In Olivares, the firearm was found in the common area of a house the defendant shared with two other codefendants, both of whom pled guilty to possession of the gun and the illicit drugs that were also found in the home. In the present case, defendant does not dispute he owned the firearm, claiming he kept it for self-defense.[16]

With respect to Moses, the prosecutor acknowledged the State was not likely to obtain a conviction at trial. The State made no such concession in the present case. The Attorney General Directive expressly allows a prosecutor to

---

[16] In section V, infra, we address how the concept of keeping a firearm for self-protection applies in the case of a person who is alleged to be involved in drug distribution activities.

consider "the likelihood of obtaining a conviction at trial" in deciding whether to grant a Graves Act waiver. Attorney General Directive at 12. See also AOC Directive #09-18 at 2 (instructing that dismissal of a Graves Act offense may only be approved by a judge in limited prescribed circumstances, including when "[t]he prosecutor represents on the record that there is insufficient evidence to warrant a conviction, or that the possibility of acquittal is so great that dismissal is warranted in the interests of justice.").

We believe the prosecutor's representation on the record that the case against Moses was weak explains why the State in that case agreed to a Graves Act waiver, thus distinguishing Moses from the present case where the prosecutor has not made a comparable concession. We recognize that the trial court expressed skepticism as to the State's ability to prove the charged Graves Act offenses. It bears repeating that under the patent and gross abuse of discretion standard, a reviewing court should not substitute its judgment for the prosecutor's assessment of the relative strengths and weaknesses of the State's trial proofs. We add also that defendant has not filed a motion to dismiss the Graves Act charges returned by the grand jury. Defendant's guilt or innocence ultimately must be decided at trial after the State has presented its evidence, not by a court reviewing a pre-trial Graves Act waiver motion.

We next address the distinctions drawn by the prosecutor with respect to State v. Miller.  That case presents a closer call since the record is relatively sparse with respect to the specifics of that particular case.  At first glance, there appear to be obvious similarities between Miller and the present case, and some of the differences suggest that Miller was a less favorable candidate for a Graves Act waiver than defendant Rodriguez.  As the prosecutor acknowledged, Miller carried a loaded firearm on his person.[17]  Miller also had a criminal record, although he was not charged as a "certain person," which would have rendered him legally ineligible for a Graves Act waiver under N.J.S.A. 2C:43-6.2.

Miller fled on foot from police who were attempting to execute an outstanding arrest warrant.  Although Miller obviously was charged with a Graves Act offense for possession of the loaded handgun, we do not know the other charges filed against him.  The record shows that besides the handgun, Miller was found with a single bag of crack cocaine.  We do not know whether he was charged with simple possession of CDS or the more serious offense of

---

[17] We note that the Attorney General's Brimage Guidelines expressly recognize carrying a firearm on one's person warrants enhanced punishment when calculating the plea offer for a defendant charged with a violation of N.J.S.A. 2C:39-4.1. See Revised Attorney General Guidelines for Negotiating Cases Under N.J.S.A. 2C:35-12 (July 15, 2004), at 90–91.  The record does not indicate whether Miller was charged with this offense.

possession with intent to distribute. We also do not know whether he was charged with a violation of N.J.S.A. 2C:39-4.1.

At oral argument, the prosecutor argued defendant and Miller were not similarly situated. The prosecutor highlighted that unlike Miller, defendant Rodriguez was the subject of an ongoing narcotics investigation, engaged in multiple controlled buys as part of that investigation, and was believed to be using his residence for drug distribution-related activity as shown by the issuance of a search warrant for that premises. Additionally, the prosecutor argued defendant frustrated the search warrant not only by fleeing from police, but also by discarding a significant quantity of cocaine from the fleeing vehicle. The prosecutor also noted defendant allegedly possessed a greater quantity of cocaine than was found in Miller's possession.

These distinguishing circumstances are in some respects more nuanced than the objective[18] distinctions in <u>Olivares</u> and <u>Moses</u>. The prosecutor might have provided a more fulsome explanation of the circumstances pertaining to the <u>Miller</u> prosecution, including the specific charges he faced and the manner

---

[18] By objective, we mean the incontrovertible fact that Olivares and Moses had both pled guilty pursuant to negotiated plea agreements. So too, the specific charges lodged against a defendant by complaint-warrant issued by a judge or indictment returned by a grand jury are objectively verifiable facts. <u>Cf.</u> <u>State v. Nyhammer</u>, 197 N.J. 383, 404-05 (2009) (noting for purposes of administering <u>Miranda</u> warnings that the issuance of a complaint-warrant is "an objectively verifiable and discrete fact.").

by which he was convicted. Even so, viewing the proffered distinctions through the lens of the deferential standard of review, we believe the prosecutor articulated sufficient reasons to distinguish defendant's situation from Miller's. A person who is the target of an ongoing narcotics investigation—one that involves the use of labor-intensive and potentially dangerous investigative techniques such as controlled buys and search warrants—stands in a different position from a person whose drug and gun offenses were only discovered following the spontaneous execution of an outstanding arrest warrant. Given the investment of law enforcement resources associated with a sustained narcotics investigation, we presume that investigative targets are not selected randomly or haphazardly, but rather for some reason, such as their suspected role within the drug distribution network or their potential to become confidential informants or cooperating witnesses. We conclude; therefore, defendant's situation was different from Miller's by virtue of defendant's status as the target of an ongoing law enforcement investigation. We also believe the State did not abuse its discretion in distinguishing defendant Rodriguez's alleged attempt to discard a substantial quantity of incriminating CDS during flight from the circumstances of Miller's flight.

Even if we were to reject the prosecutor's proffered distinctions and discern that Miller was similarly situated to defendant, that conclusion would not complete our review under the comparative analysis methodology. As we have noted, prosecutors should not be held to the standard of perfect consistency in exercising their Graves Act waiver discretion. Cf. State v. Megargel, 143 N.J. 484, 500 (1996) ("We realize that there is no calculus that will guide the pen to the perfect sentence.") (quoting State v. Hodge, 95 N.J. 369, 379 (1984)). Identifying a single case where a similarly situated defendant was granted leniency, therefore, does not prove arbitrariness or discriminatory treatment sufficient to overrule the prosecutor's otherwise reasoned Graves Act waiver decision. We therefore hold that in this instance, the comparative analysis methodology does not support the trial court's conclusion the prosecutor acted in an arbitrary and discriminatory manner in rejecting defendant's request for a Graves Act waiver.

V.

We next address the trial court's ruling the prosecutor patently and grossly abused discretion in assessing the aggravating and mitigating factors pertaining to this case.

## A.

The trial court concluded the prosecutor placed undue weight on the seriousness of the offense conduct, and did not accord sufficient weight to the circumstances militating in favor of a Graves Act waiver, including defendant's lack of a criminal record, mature age, family status, and gainful employment. For example, the court commented, "[t]herefore, the court gives [the contention that defendant's rifle was possessed in furtherance of drug distribution activity] minimal weight and instead weighs [d]efendant's lack of criminal history more heavily."

In explaining the patent and gross abuse of discretion standard, the Court in Nwobu noted a clear error of judgment constituting a patent and gross abuse of discretion is one that "could not have reasonably been made upon a weighing of the relevant factors." Nwobu, 139 N.J. at 254 (quoting State v. Roth, 95 N.J. 334, 366 (1984)). Moreover, the weighing of aggravating and mitigating factors is a qualitative process, not a quantitative one.

We do not believe the prosecutor in this case committed a patent and gross abuse of discretion by ascribing greater weight to the circumstances pertaining to the offense than to those circumstances pertaining to the offender. Indeed, the prosecutor's emphasis on the offense conduct and the

need for deterrence comports with basic sentencing principles. As our Supreme Court explained in Megargel,

> It is, therefore, paramount that the sentence reflect the Legislature's intention that the severity of the crime now be the most single important factor in the sentencing process. The focus on the offense rather than the offender is inexorable in formulating a sentence. The paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence.
>
> [143 N.J. at 500 (citations omitted)].

The prosecutor's focus on deterrence is especially appropriate in the context of the Graves Act. See Benjamin, 228 N.J. at 367 (explaining that "[u]nderlying this statute is a legislative intent to deter individuals from committing firearm-related crimes by calling for a mandatory minimum term of imprisonment for those convicted of Graves Act offenses") (quoting Des Marets, 92 N.J. at 71).

## B.

The trial court identified several points with which it disagreed with the prosecutor's assessment of the nature and seriousness of the offense. We now address those specific points to determine whether they demonstrated a patent and gross abuse of prosecutorial discretion.

45

We first examine the trial court's finding that there was "no evidence to support the conclusion that [d]efendant possessed the firearm in further[ance] of his 'drug dealing,' as the State suggest[ed]." The trial court reasoned the firearm was not the type of weapon typically used in drug offenses, and that it was not found on defendant's person but rather in his bedroom away from any drugs.

In practical effect, the trial court found the State could not prove that defendant committed a violation of N.J.S.A. 2C:39-4.1.[19] In State v. Spivey, the Court held that a violation of N.J.S.A. 2C:39-4.1 requires a "temporal and spatial link between the possession of the firearm and the drugs that defendant intended to distribute." 179 N.J. 229, 239 (2004). The Court further explained:

> The evidence must permit the jury to infer that the firearm was accessible for use in the commission of the crime. The inference to be drawn—that the gun was possessed in the course of committing the drug offense—becomes more tenuous the further removed the gun is from the drugs. For example, a person could constructively possess in a New Jersey home drugs that he intends to distribute at the same time he constructively possesses a hunting rifle in a California home. In such a case, without some showing of a connection between the two, the evidence would not

---

[19] As we have already noted, defendant did not move to dismiss the count of the indictment charging him with a violation of N.J.S.A. 2C:39-4.1.

permit a reasonable inference that the person constructively possessed the rifle while in the course of committing a drug offense 3000 miles away. The closer in proximity a firearm is to drugs, the stronger and more natural the inference that the two are related to a common purpose. We cannot limn the multitude of scenarios that would permit the drawing of a reasonable inference that a firearm is possessed while in the course of committing a drug offense. There is no formulaic solution; each case is fact-sensitive. We leave that decision to the sound discretion of our trial courts.[20]

[Id. at 239–40.]

We do not believe the spatial and temporal link between the weapon and drugs was insufficient to establish a violation of N.J.S.A. 2C:39-4.1 simply because the firearm and CDS were found in different rooms. The present situation is readily distinguishable from the hypothetical example the Court in Spivey used to illustrate an insufficient nexus—that is, where a hunting rifle is constructively possessed 3000 miles away from where the drugs are kept. We do not read Spivey to suggest that as a matter of law, keeping drugs and guns

---

[20] The Court in Spivey addressed whether the trial court erred in denying the defendant's motion for acquittal at the conclusion of the State's case at trial. 179 N.J. at 235. The Court's reference that the decision on a motion for judgment of acquittal is left "to the sound discretion of our trial courts," id. at 240, does not suggest that in the context of a pretrial motion to overrule a prosecutor's denial of a Graves Act waiver, discretion resides with the trial court rather than the prosecutor.

in different rooms in the same house falls outside the ambit of N.J.S.A. 2C:39-4.1.

Nor is it dispositive that police found only a small quantity of drugs in defendant's house. Although drug amounts are used to determine the gradation of a violation of the offense of distribution/possession with intent to distribute CDS, see N.J.S.A. 2C:35-5(c), our law does not prescribe a minimum amount to prove an intent to distribute.[21] Rather, that determination depends on the totality of the relevant circumstances. See Model Jury Charges (Criminal), "Possession of a Controlled Dangerous Substance with Intent to Distribute (N.J.S.A. 2C:35-5)," at 2 (rev. June 8, 2015) ("The intention [to distribute] may be gathered from a person's acts, conduct, from all the person said and did at the particular time and place, and from all of the surrounding circumstances. You may consider any evidence as to the quantity, purity, and packaging of [the controlled substance] together with all the other evidence in the case to aid you in your determination of the element of intent to distribute."). If, for example, the State at trial can prove that defendant possessed the eighteen grams of discarded cocaine with intent to distribute, then the jury would be free to infer whether first, the two grams of cocaine found in his house were

---

[21] We note N.J.S.A. 2C:35-5(c) permits the aggregation of amounts involved in individual acts of distribution and possession with intent to distribute.

also possessed with an intent to distribute, and second, those drugs were sufficiently proximate to the firearm to prove a violation of N.J.S.A. 2C:39-4.1.

Defendant is, of course, free at trial to argue he did not possess the firearm in the course of committing a drug offense, and ultimately, it is the State's burden to prove a violation of N.J.S.A. 2C:39-4.1 beyond a reasonable doubt. But for purposes of applying the deferential standard of review announced in Alvarez and Benjamin, we conclude the prosecutor did not commit a clear error in judgment or otherwise abuse discretion in drawing an inference that defendant possessed the stolen rifle in the furtherance of committing a drug offense.

The trial court also found the firearm in this case is not the type of weapon typically associated with drug dealing. In reaching this conclusion, the trial court made no mention that the weapon had been stolen, or that the search of defendant's home also revealed hollow point ammunition. So far as we can tell, the trial court's observation is not based on expert opinion in the record or on published authority explaining the type(s) of weapons preferred by drug dealers. We nonetheless except for the sake of argument that a .22 caliber rifle with a telescopic gunsight is not the typical weapon of choice for drug dealers. That does not necessarily mean; however, this particular weapon

was not possessed in furtherance of defendant's alleged drug distribution activities.

Defendant does not argue the rifle was used solely for hunting. Rather, he asserts the weapon was kept in his home for "self-protection."[22] For purposes of deciding whether to grant a Graves Act waiver, the concept of self-protection must be viewed in the context of the illicit drug trade in which defendant is alleged to participate. For obvious reasons, drug dealers may be wary of relying on police to protect their illicit drugs and the cash proceeds of their sale. Drug dealers are especially vulnerable to robbery, burglary, and other crimes because would-be attackers know drug dealers are not likely to report offenses and solicit aid from police. As we have already noted, a report

---

[22] In Andrews, we cited State v. Harmon, 104 N.J. 189, 207 (1986), for the proposition that "[i]f an individual's possession of a firearm is motivated honestly by a self-protective purposes, then his conscious object and design may not be to do an unlawful act and a material element of a [N.J.S.A. 2C:39-4(a)] violation has not been met." Andrews, 464 N.J. Super. at 118, n.2. In Harmon, a BB gun was drawn during an argument. The issue was whether the jury was properly instructed on the culpable mental state required to convict for possession of a firearm "for an unlawful purpose" in view of the affirmative defense of self-defense that was asserted. 104 N.J. at 191, 208—09.

We do not believe that Harmon offers guidance with respect to the distinct offense of possessing a firearm while in the course of committing, attempting to commit, or conspiring to commit a designated drug offense, N.J.S.A. 2C:39-4.1. Indeed, we do not see how the defense of "use of force in self-protection," codified in N.J.S.A. 2C:3-4, would apply in a prosecution for violation of N.J.S.A. 2C:39-4.1.

to the Governor calling for tougher gun laws cited in <u>Spivey</u> explains that "[f]irearms have become ubiquitous in the world of illegal drug activity. Dealers are armed to protect themselves from law enforcement officers, <u>from other dealers, and from their customers</u>." <u>Spivey</u>, 179 N.J. at 240 (emphasis added). It bears emphasis, moreover, the statute that generally allows persons—other than "certain persons," <u>see</u> note 7, <u>supra</u>—to keep a firearm in their residence or place of business, N.J.S.A. 2C:39-6(e), does <u>not</u> exempt criminal liability for a violation of N.J.S.A. 2C:39-4.1 or N.J.S.A. 2C:39-4(a).[23]

Accordingly, even assuming for the sake of argument that a drug dealer earnestly intends to use his firearm only defensively to protect against criminal attack by competitors or customers, he is not permitted to keep a firearm in a residential or business premises connected with his criminal activity. Relatedly, a drug dealer, like anyone else, may attempt to claim self-defense under N.J.S.A. 2C:3-4 (use of <u>force</u> in self-protection) to justify the <u>use</u> of a weapon. But that does not mean the firearm was not possessed while in the course of committing, attempting to commit, or conspiring to commit a

---

[23] The exemption from criminal liability established in N.J.S.A. 2C:39-6(e) applies only to N.J.S.A. 2C:35-5(b) (unlawful possession of a handgun), (c) (unlawful possession of a rifle or shotgun), and (d) (unlawful possession of other weapons under circumstances not manifestly appropriate for such lawful uses as it may have).

violation of N.J.S.A. 2C:35-5. <u>See</u> note 22, <u>supra</u>. In sum, we do not believe the prosecutor made a clear error of judgment or otherwise abused discretion in concluding that imposition of the Graves Act sentence is needed in this case to deter drug dealers from owning firearms.

We recognize the trial court was skeptical of the prosecutor's contention that defendant is in fact a drug dealer whose ownership of a firearm must be deterred by imposing a Graves Act sentence. The trial court, for example, questioned the prosecutor's contention that defendant was in possession of the eighteen grams of cocaine discarded from the fleeing vehicle. "It is unknown," the court remarked, "if the driver or [d]efendant discarded the items later discovered to be eighteen grams of cocaine." The court reasoned that the driver was a known drug dealer and that only two grams of cocaine ultimately were found in defendant's home pursuant to the execution of the search warrant.

The State at trial will bear the burden of proving beyond a reasonable doubt that defendant possessed the eighteen grams of cocaine within the meaning of N.J.S.A. 2C:2-1(c).[24] For purposes of applying the deferential

---

[24] N.J.S.A. 2C:2-1(c) provides:

> Possession is an act, within the meaning of this
> section, [requiring commission of a voluntary act] if

standard of review announced in <u>Alvarez</u> and <u>Benjamin</u>, we believe it was reasonable for the prosecutor to infer that the drugs thrown out the passenger-side window were discarded by the person seated in the passenger seat—defendant—and defendant knew of the criminal nature of the items discarded during the police chase. Furthermore, the fact that codefendant Quiles was a known drug dealer does not absolve defendant of culpability with respect to the contraband. Both of them may have possessed the cocaine jointly, and it is conceivable that Quiles served as defendant's supplier within a larger drug distribution network. In these circumstances, the prosecutor did not make a clear error in judgment or otherwise abuse discretion by ascribing to defendant at least joint and constructive possession of the significant quantity of discarded cocaine.[25]

## C.

Although we accord substantial deference to the prosecutor's assessment of aggravating and mitigating circumstances, there is, however, one

---

(continued)
> the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession.

[25] The record before us does not indicate whether codefendant Quiles has shown any intention of taking responsibility for the eighteen grams of cocaine.

aggravating factor found by the prosecutor that gives us pause. The prosecutor found aggravating factor three—the risk that defendant will commit another offense. N.J.S.A. 2C:44-1(a)(3). This determination was based on defendant's involvement in the multiple controlled buys and his flight when police approached to execute the search warrant. We do not doubt that both of those circumstances are relevant in assessing defendant's culpability, but not because they indicate defendant is likely to commit a new crime following the resolution of the pending charges.

For purposes of applying the patent and gross abuse of discretion standard, a clear error of judgment "is one that is 'based on appropriate factors and rationally explained,' but 'is contrary to the predominant views of others responsible for the administration of criminal justice.'" Nwobu, 139 N.J. at 253 (quoting State v. Dalglish, 86 N.J. 503, 510 (1981)). In State v. Torro, we held the sentencing judge improperly identified the likelihood that defendant would commit another offense as an aggravating factor. 229 N.J. Super. 215, 227 (App. Div. 1988). We reasoned,

> The fact that defendant had been gainfully employed for over two years, had no prior criminal record, and was a respected member of his community militate against this conclusion. Furthermore, neither the trial record nor the presentence report indicate that defendant was involved in the distribution of drugs on more than one occasion.

[Ibid.]

We recognize in the case before us, defendant is alleged to have been involved in the distribution of drugs on more than one occasion, as the prosecutor duly noted with respect to the multiple controlled buys giving rise to the search warrant. Even so, we believe defendant's minimal prior contact with the criminal justice system—a single conditional discharge in 1990—coupled with his family background, age, and employment history, provides a far better indication of the risk that defendant will commit a future offense. We add that the State did not seek pretrial detention under the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, based on the risk defendant would commit another offense if released.

We believe that in finding aggravating factor three, the prosecutor essentially conflated the risk that defendant would commit another offense with the need to deter him, and others, from committing a future offense. We therefore agree with the trial court that the prosecutor erred in citing aggravating factor three.

That does not automatically mean, however, that this error warrants overruling the prosecutor's ultimate decision to reject defendant's application for a Graves Act waiver. Importantly, the prosecutor explicitly acknowledged defendant's lack of criminal history and found mitigating factor seven,

N.J.S.A. 2C:44-1(b)(7) ("[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense"). In this context, we do not believe the prosecutor failed to consider a relevant circumstance within the meaning of the patent and gross abuse of discretion standard of review. See Nwobu, 139 N.J. at 247. Nor did the prosecutor consider an irrelevant or inappropriate factor. Ibid. At most, the prosecutor erred in citing the repetitive drug transactions and attempted spoilation of evidence—aggravating circumstances to be sure—as a basis for finding aggravating factor three.

It is evident the prosecutor's chief concern was the need for deterrence based on the nature and seriousness of the offense conduct. N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law"). It also is evident the prosecutor believed the aggravating circumstances reflected in the offense conduct outweighed the mitigating circumstances reflected in defendant's lack of criminal history, family background, and gainful employment, all of which the prosecutor acknowledged. Given the qualitative nature of the weighing process, we do not believe the prosecutor's decision would have been different had aggravating factor three not been cited. Nor do we believe the prosecutor's misapplication of that aggravating factor constitutes an error of judgment and resultant abuse of discretion of such

magnitude and impact as to justify overruling the prosecutor's Graves Act waiver decision.

## VI.

We conclude our analysis with the observation that, as in <u>Andrews</u>, we believe "'within the constellation of Graves Act cases,' this one is 'deserving of some leniency,'" <u>Andrews</u>, 461 N.J. Super. at 124 (quoting <u>State v. Mello</u>, 297 N.J. Super. 452, 468 (App. Div. 1997)). While we might have reached a different conclusion than the prosecutor if it was our decision to make in the first instance, and while we appreciate and respect the concerns raised by the trial judge, who was committed to conducting a thorough and robust review as required by <u>Alvarez</u>, <u>Benjamin</u>, and <u>Andrews</u>, we do not believe defendant established a patent and gross abuse of prosecutorial discretion. We therefore are constrained to reverse and vacate the order overruling the prosecutor's decision to reject defendant's request for a Graves Act waiver. Nothing in this opinion shall be construed to limit the parties from engaging in plea negotiations that might yet result in a Graves Act waiver.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION